UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                  :
JEAN ROBERT DUCHATELIER,              :

                       Plaintiff,       :
                                  :   **MEMORANDUM**
    -against-                       :   **DECISION & ORDER**

COMMISSIONER OF SOCIAL SECURITY, :   08 Civ. 3684 (KAM)

                     Defendant.     :
------------------------------------------------------------x

**Matsumoto, District Judge:**

This is an appeal of the Commissioner of Social Security's denial of plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). Plaintiff, *pro se*, contends that he is entitled to receive SSI benefits due to severe medically determinable impairments, which he alleges prevent him from performing any work. Presently before the Court is defendant's motion for judgment on the pleadings. For the reasons stated below, defendant's motion is granted.

## *BACKGROUND*

**I.    Procedural History**

Plaintiff applied for SSI benefits on March 8, 2005, contending that he had been disabled due to complications from a gunshot wound to the head that he sustained in 1980, and that he had not worked or been able to work since June 1, 1991. Tr. at 35.[1] The Social Security Administration denied his application on May 4, 2005. Tr. 30.

---

[1] The abbreviation "Tr." refers to the administrative record (Tr. 1-235) and supplemental administrative record (Tr. 236-247).

1

After his claim was denied, plaintiff obtained a hearing before an Administrative Law Judge ("ALJ"), which was held on May 9, 2006. Tr. 220-35. Plaintiff was not represented by counsel. Tr. 222. On June 1, 2006, the ALJ issued a decision denying plaintiff's application, finding that, based on the entire record, including plaintiff's medical records, plaintiff did not have an impairment or combination of impairments that was "severe" within the meaning of the regulations (20 C.F. R. § 416.920(c)), that is, an impairment or combination of impairments that would significantly limit his ability to perform basic work activities. Tr. 244-47 (decision of ALJ Mark Hecht). The ALJ's opinion also noted that plaintiff had failed to attend either of two scheduled consultative internist and psychiatric examinations. Tr. 247.

On November 28, 2006, the Appeals Council granted plaintiff's request for review, vacated the ALJ's decision, and remanded the case to the ALJ with instructions that the ALJ: 1) obtain additional evidence concerning the claimant's mental and physical impairments in order to complete the administrative record; 2) further evaluate plaintiff's credibility as to his subjective complaints; and 3) afford plaintiff another opportunity to attend a consultative examination in order to determine what work plaintiff could still perform despite his impairments. Tr. 236-40.

On March 15, 2007, the ALJ held a supplemental hearing, at which plaintiff was represented by counsel. Tr. 192-219. Prior to the supplemental hearing, in February 2007, plaintiff filed an application for SSI benefits based on his having reached the age of 65, and was granted benefits on that ground effective December 18, 2005 (the date on which he reached the age of 65). Accordingly, in a memorandum filed prior to the hearing, plaintiff's counsel amended the end date of plaintiff's disability from "ongoing" to December 17, 2005, and

2

conceded that it was no longer necessary for the ALJ to determine if plaintiff could work on an ongoing basis. Plaintiff's counsel also amended the onset date of plaintiff's alleged disability from June 1, 1991 to March 8, 2005, the date on which plaintiff's application for SSI was filed. Tr. 10, 217.[2] Accordingly, the instant dispute over plaintiff's eligibility for SSI benefits concerns a period of slightly less than nine months (April 1, 2005 through December 17, 2005).

On August 28, 2007, the ALJ issued a decision again finding that plaintiff was not disabled within the meaning of the Act because he did not have a severe impairment. Tr. 7-15. Thereafter, plaintiff requested that the Appeals Council review the ALJ's decision. Tr. 5-6. On July 11, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision on Mr. Duchatelier's claim for benefits. This appeal followed.

## II.     Non-Medical Facts

Plaintiff was born on December 18, 1940 in Haiti. Tr. 196. He was educated in Haiti through the twelfth-grade, and is able to read and write English.[3] Tr. 197. Plaintiff came to the United States in 1975, and is currently a United States citizen. Tr. 224-25. He is divorced, has two children, and currently resides in Brooklyn. Tr. 197.

After arriving in the United States, plaintiff was briefly employed as a gas station attendant, and by 1980 had obtained employment as a taxi driver. Tr. 198, 226. Plaintiff

---

[2]    SSI benefits generally cannot be paid prior to the first day of the month following the date such application was filed. *See* 42 U.S.C. § 1382(c)(7). Both plaintiff's counsel and the ALJ appear to have assumed that plaintiff became eligible for SSI benefits on the date of his application (March 8, 2005) rather than the first day of the month following that date (April 1, 2005). Because this opinion affirms the denial of plaintiff's SSI benefits, this discrepancy is not material.

[3]    At plaintiff's first hearing, he testified that he does not have any difficulty reading or writing in English. Tr. 226. At his second hearing, he testified that he can read and write in English "a little bit." Tr. 197. Plaintiff's testimony during the two hearings before the ALJ, which were conducted in English, is at times difficult to comprehend due to numerous language, audibility or transcription difficulties. For instance, in response to a question asking what his position was while employed by a restaurant, plaintiff responded that he was an "umpire." Tr. 230. In addition, the transcript records plaintiff's response to the question "were you taken to a hospital [after being shot]?" as "Yeah, that's a -- the police, you know, they don't want (INAUDIBLE) the ambulance coming to pick me up there. The police just jumped me back (INAUDIBLE)." Tr. 201

testified that in May 1980 he sustained a gunshot wound to his head during a robbery attempt. Tr. 200-01. As a result of the injury, he lost consciousness and was taken to the hospital for surgery, where he was held overnight and discharged the following morning. Tr. 201, 228-29.

Plaintiff testified that following the injury he returned to work as a taxi driver but was only able to work between one and three days per week because he experienced frequent nose-bleeds and headaches, loss of memory, an inability to concentrate, and occasional vomiting. Tr. 199, 209, 211, 214, 228-29; *see also* Tr. 48. He also worked for approximately four years driving a tractor-trailer truck, but testified that the above medical ailments similarly limited his ability to perform that work on a full-time basis. *Id.* Plaintiff stated that his most recent period of significant employment was as a taxi driver, and that he has not worked in that position since 1991.[4] Tr. 49, 199-200.

In 1991, plaintiff travelled to Haiti, where he remained until returning to the United States in approximately 1995. Tr. 202-03. Plaintiff testified that he has not been able to work on a full-time basis since returning to the United States, although he has on occasion performed some part-time work, such as helping a relative by "com[ing] in. . . to watch people" at the relative's restaurant. Tr. 230. Plaintiff stated that he has not worked in any capacity since 2004, and has subsisted though the charity of friends and relatives. Tr. 231.

On March 8, 2005, following an interview, an initial disability report (Form S.S.A.-3367) was completed on plaintiff's behalf by the Social Security field office. The interviewer, W. Chan, noted that plaintiff came to the interview himself, and observed that

---

[4] Plaintiff's testimony regarding his employment history is inconsistent. In plaintiff's first hearing he testified that his last job was as a taxi driver and ended in or around 1996. Tr. 209, 229. In plaintiff's second hearing he testified that his last job was as a tractor-trailer truck driver and ended in 1991. Plaintiff alternately stated that he held the job of truck driver for either four years or eleven years. *Compare* Tr. 199-200 *with* 201.

4

plaintiff "looked tired and weak . . . his concentration was not that well [sic] . . . [he had] lost some of his memory [and] his breathing was very heavy." Tr. 55-56. A more extensive disability report (Form S.S.A.-3368), apparently prepared that same day or shortly thereafter based on information supplied by plaintiff, states that plaintiff suffers from "head injury" and "back pain" and that he has "lost most of [his] memory, [suffers from] headache[s], [and] cannot focus well."[5] Tr. 49. The sole medication listed is hydrochlorothiazide, which plaintiff identified as a pain killer.[6] Tr. 51.

At the first hearing, on May 9, 2006, plaintiff stated that he continues to suffer from headaches approximately three to four days per week, and nosebleeds approximately three days per week, which he believes to be attributable to the 1980 gunshot injury. Tr. 214. In addition, he testified that he currently suffers from high blood pressure, and from abdominal complaints including bleeding in his stomach, which required hospitalization on one occasion. Tr. 231-34. Plaintiff stated that he was not at that time taking any medications aside from iron supplements for anemia. Tr. 234.

At the second hearing, on March 15, 2007, plaintiff stated that he had suffered from stomach and back pains in the past, but that they were both effectively controlled by prescription medication. Tr. 210-11. He further testified that he had previously been taking three or four Advil[7] pills each day, but that he had ceased taking that medication on the instruction of his physician. Tr. 212-13. Plaintiff was not certain whether the directive to avoid

---

[5] Form SSA-3368 is undated, but is marked as having been printed on March 11, 2005. Tr. 48.

[6] Hydrochlorothiazide is a diuretic indicated for the treatment of high blood pressure, rather than a pain medication. *See* The Merck Manual of Diagnosis and Therapy, *hydrochlorothiazide* (18th Ed. 2006) *available at* http://www.merck.com/mmpe/lexicomp/hydrochlorothiazide.html.

[7] Advil, a brand name preparation of the drug ibuprofen, is a non-steroidal anti-inflammatory drug ("NSAID"), a class of drugs with analgesic (pain relieving), antipyretic (fever reducing), and anti-inflammatory effects. See *Stedman's Medical Dictionary* 775 (27th Ed. 2000) ("Stedman's").

Advil was related to his complaints of nose bleeds and bleeding in his stomach.[8] At the time, plaintiff was also taking medications for high blood pressure and for an enlarged prostate. Tr. 210.

## III. Medical Facts

### A. *Plaintiff's Medical Records prior to December 18, 2005 (the date on which he reached the age of 65)*

Plaintiff's earliest available medical records consist of notes from a May 2001 physical exam at Kings County Hospital Center ("KCHC") concerning a rash on plaintiff's right thigh. The physician's notes from that visit indicate a history of hypertension,[9] and state that the rash appeared to be either an ulcer, an irritation from habitual scratching or an insect bite. Tr. 77. By July 12, 2001, the rash had healed. Tr. 82. Plaintiff was again seen at KCHC in May 2001 for a lower urinary tract infection. The treating physician's notes indicate that plaintiff had hypertension and that blood was present in plaintiff's urine. Tr. 79. Plaintiff was given a prescription for medication to lower his blood pressure, and further tests of plaintiff's urine were planned. *Id.*

Plaintiff's medical records from August 2001 reflect that plaintiff, who was being followed for hypertension, complained of back pain. Tr. 81. In January 2002, plaintiff's hypertension was evaluated at KCHC's medical clinic and treatment options were suggested, including a diet plan and medication. Tr. 75. Plaintiff was again seen for back pain and hypertension at KCHC in July 2002. Tr. 80.

---

[8] Gastrointestinal ("GI") bleeding is a known side effect of ibuprofen. *See* Tr. 97 (listing NSAIDs as constituting a risk factor for GI bleeding); *see also* Food and Drug Administration, Postmarket Drug Safety Information for Patients and Providers Regarding Ibuprofen, *available at* http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm125225.htm (last accessed Mar. 22, 2010) (noting GI bleeding risk).

[9] "Hypertension" refers to high blood pressure which is elevated to a level likely to induce cardiovascular damage or other adverse consequences. *See* Stedman's *at* 855.

On April 17, 2003, plaintiff complained of skin itching and admitted that he had not taken any blood pressure medication for two months. Tr. 72-73. He was diagnosed with hypertension and pruritus.[10] Plaintiff was instructed to keep his clinic appointments and was prescribed Atarax[11] for his pruritus and Norvasc for his hypertension.[12]

  B. *Plaintiff's medical records after December 18, 2005*

Plaintiff was hospitalized at KCHC from January 9, 2006 to January 14, 2006 after complaining of abdominal pain and black tarry stool occurring over the prior two weeks.[13] On admission, it was noted that plaintiff had a history of hypertension, benign prostatic hypertrophy ("BPH"),[14] anemia,[15] thrombocytosis,[16] and back pain. Tr. 89, 126. The physical examination on admission revealed the presence of blood in plaintiff's stool, mild tenderness in

---

[10] "Pruritus" refers to itching of the skin. *See* Stedman's at 1648.

[11] Atarax, a brand-name preparation of the drug Hydroxyzine HCl, is a drug with anxiolytic (anti-anxiety) and antihistamine properties, and is used, *inter alia*, for the treatment of pruritus. *See* RxMed pharmaceutical monographs: Atarax, *available at* http://www.rxmed.com/b.main/b2.pharmaceutical/b2.1.a.index.html (last accessed Mar. 22, 2010).

[12] Norvasc, a brand-name preparation of the drug amlodipine besylate, is calcium channel blocker, a class of drugs used to treat hypertension. *See* Pfizer, *Highlights of Prescribing Information for Norvasc*, *available at* http://www.pfizer.com/files/products/uspi_norvasc.pdf. (last accessed Mar. 22, 2010).

[13] Black tarry stool refers to a dark-colored, viscous bowel movement, which may indicate the presence of blood in the stomach or small intestine. *See* Stedman's at 1084; *see also Merriam-Webster Medical Dictionary* (2005), definition of "tarry stool," *available at* http://www.merriam-webster.com/medical/tarry%20stool.

[14] "Benign prostatic hypertrophy" refers to a non-malignant (non-cancerous) enlarged prostate. It is a common condition in older men, and may cause urination and bladder problems. *See* MedlinePlus Encyclopedia, *Enlarged Prostate*, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000381.htm (last accessed Mar. 22, 2010).

[15] "Anemia" is a general term for any condition in which the number of red blood cells is less than normal. *See* Stedman's at 73.

[16] "Thrombocytosis" refers to an increase in the number of platelets in the circulating blood. *See* Stedman's at 1831.

the upper central region of his abdomen, an enlarged prostate, and mild edema[17] of the extremities. Tr. 89. However, no limitations on movement were noted. Tr. 98-99. An examination at 1 A.M. on the morning of January 10 recorded plaintiff as "negative" for headache, vomiting, head injury, or memory changes. Tr. 102. Plaintiff's hospitalization records note that he has was previously diagnosed with anemia in 2003 but has not been taking iron supplements. Tr. 126-27, 161-62. A blood transfusion to address plaintiff's anemia was suggested a number of times by KCHC medical personnel but plaintiff repeatedly refused. Tr. 115, 117, 119-22, 128, 132.

On January 10, 2006, plaintiff underwent a gastroenterology consult by Dr. Manojkumar Singh at KCHC. Dr. Singh's examination reflected normal results except for minimal tenderness in the upper central abdomen, and his report notes that plaintiff has a history of hypertension, thrombocytosis, and melena[18] and has been taking NSAIDs for the last 1-2 years for chronic back pain. Tr. 126-27. An endoscopy[19] which was performed on January 10, 2006, revealed erosive gastritis,[20] ulcers in the stomach, inflammation in the small intestine, and small whitish plaques in the lower esophagus. Tr. 128, 134-35. Biopsy samples taken from the

---

[17] "Edema" refers to an accumulation of an excessive amount of watery fluid in cells or intercellular tissues. *See* Stedman's at 566-67.

[18] "Melena" refers to black tarry stool caused by the presence of blood. *See Stedman's* at 1084.

[19] The term "endoscopy" refers to an examination of the interior sections of the body by means of a special instrument, such as an endoscope. *See Stedman's* at 594.

[20] Erosive gastritis is an inflammatory condition characterized by erosions of the mucous membrane lining the stomach, and may result in nausea, pain, or gastric (stomach) bleeding. *See Gastritis: Peptic Disorders*, Merck Manual Home Edition (2008) *available at* http://www.merck.com/mmhe/sec09/ch121/ch121b.html (last accessed Mar. 22, 2010).

endoscopy were positive for *H. pylori*.[21] Tr. 138-39. Dr. Singh recommended that plaintiff receive further testing, avoid NSAIDs and take Prevacid twice-daily.[22]

On January 11, 2006, a CT-scan[23] of plaintiff's abdomen revealed a thrombus (blood clot) in the region between plaintiff's superior mesenteric artery, which supplies blood to a large portion of the intestine, and the left renal artery, which supplies blood to the left kidney.[24] Tr. 178-79. A colonoscopy performed the following day revealed a polyp, which was removed, and an arterio-venous malformation in the terminal section of the large intestine.[25] Tr. 132. Tests confirmed anemia, melena, BPH and hypertension. Tr. 140-60, 163-74, 181. Upon discharge from the hospital on January 14, 2006, plaintiff received prescriptions, including

---

[21] *H. pylori*, short for *Helicobacter pylori*, is bacterium that can inhabit various areas of the stomach and duodenum (the first section of the small intestine). In most cases, the presence of *H. pylori* does not lead to any symptoms or complications. However, *H. pylori* can in some cases lead to serious complications, including ulcers and stomach cancer. *See* Mayo Clinic Staff, *H. pylori infection* (2009), *available at* http://www.mayoclinic.com/health/h-pylori/DS00958 (last accessed Mar. 22, 2010).

[22] Prevacid, a brand-name preparation of the medication lansoprazole, is a member of the class of drugs known as proton-pump inhibitors, and is used to treat or prevent stomach and intestinal ulcers, and other conditions involving excessive stomach acid. *See* Takeda Pharmaceuticals, highlights of prescribing information for Prevacid, *available at* http://www.tpna.com/products/default.aspx (last accessed Mar. 22, 2010).

[23] A CT scan, an abbreviation for a computerized tomography scan, combines a series of X-ray views taken from many different angles to produce cross-sectional images of the bones and soft tissues inside the body. *See* Mayo Clinic Staff, *CT-scan* (2009), *available at* http://www.mayoclinic.com/health/ct-scan/MY00309 (last accessed Mar. 22, 2010).

[24] *See generally*, Merck Manual, *on Occlusive Peripheral Arterial Disease*, *available at* http://www.merck.com/mmhe/sec03/ch034/ch034b.*html* (last accessed Mar. 22, 2010).

[25] A colonoscopy is a visual examination of the inner surface of the colon (large intestine) by means of a colonoscope, and is one method of identifying colon polyps, *i.e.*, growths of tissue on the surface of the colon. While most colon polyps are harmless, they are typically removed when identified. *See* National Digestive Diseases Information Clearinghouse, *What I need to know about Colon Polyps*, available at http://digestive.niddk.nih.gov/ddiseases/pubs/colonpolyps_ez/ (last accessed Mar. 22, 2010). An arterio-venous malformation (AVM) is a defect of the connection between a vein and an artery, and may cause complications including internal bleeding. *See* National Institute of Neurological Disorders and Stroke, *Arteriovenous Malformation Information Page*, http://www.ninds.nih.gov/disorders/avms/avms.htm (last accessed Mar. 22, 2010).

Epogen[26] and iron supplements for his anemia, and antibiotics for his *H. pylori* infection. Tr. 90-91, 109. He also received prescriptions for doxazosin mesylate and omeprazole magnesium.[27] The discharge instructions permitted plaintiff to engage in any activity that he could tolerate and recommended a low sodium diet. Tr. 91.

On December 14, 2006, plaintiff was examined by Dr. Theodore Jean-Francois. Plaintiff reported that his symptoms consisted of "lower back pain off and on for [the] past 1-2 years" and pain on bending more than 90 degrees. Tr. 187. Dr. Jean-Francois diagnosed essential hypertension,[28] lumbosacral arthralgia,[29] and BPH. He also noted that the plaintiff had osteoarthritis, a degenerative joint disease that could produce pain. Dr. Jean-Francois' notes from the December 14, 2006 examination identify only a single medication being taken by plaintiff, Proscar,[30] and state that Proscar would not limit plaintiff's activities. Tr. 188. In the section entitled "additional comments," Dr. Jean-Francois stated "I cannot comment on patient's ability to do work related activities." Tr. 191.

Beginning in January 2006 and continuing to March 2007, Dr. Kesler Dalmacy examined plaintiff every other month. Tr. 182. In a report dated March 3, 2007, Dr. Dalmacy

---

[26] The medication Epogen is designed to stimulate red blood cell production. *See* Amgen, *Epogen Prescription Information Sheet*, *available at* http://www.epogen.com/pdf/epogen_pi.pdf (last accessed Mar. 22, 2010).

[27] Doxazosin mesylate, a medication sold by Pfizer under the brand names Cardura and Carduran, is used to treat high blood pressure and benign prostatic hyperplasia. *See* Cardura prescribing information, available at http://www.pfizer.com/files/products/uspi_cardura.pdf (last accessed Mar. 22, 2010). Omeprazole magnesium, sold under the brand name Prilosec, is used to treat conditions including gastrointestinal ulcers. *See* MedlinePlus, *Omeprazole*, *available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html.*

[28] "Essential hypertension" refers to hypertension with no known cause. *See* Stedman's at 856.

[29] Lumbosacral arthralgia refers to pain in the lumbosacral region (i.e. the lower back), especially where such pain is not inflammatory in character. *See* Stedman's at 149.

[30] Proscar, a brand name preparation of the drug finasteride, is used to treat BPH. *See* Merck, *Patient Information About Proscar*, *available at* http://www.merck.com/product/usa/pi_circulars/p/proscar/proscar_ppi.pdf (last accessed Mar. 22, 2010).

noted that plaintiff complained of severe headaches, occasional chest pain, and shortness of breath, and diagnosed anemia, hypertension and peptic ulcers. Dr. Dalmacy's report notes that plaintiff has taken the following medications: hydroxyurea,[31] Flomax,[32] doxazosin mesylate, and the antibiotic Cipro. In response to a question inquiring whether any of plaintiffs' medications would have side-effects or limit his activities, Dr. Dalmacy answered in the affirmative, but did not provide further explanation as requested on the form. Dr. Dalmacy's report notes that plaintiff had to lie down for about three hours per day; that plaintiff cannot bend, squat, climb or reach; that plaintiff is subject to "moderate" restrictions with respect to standing on unprotected heights and being around moving machinery; and that plaintiff is subject to "mild" restrictions on being exposed to marked changes in temperature and humidity, driving a motor vehicle, and being exposed to dust, fumes and gasses. Dr. Dalmacy's report further notes that plaintiff is able to lift and carry ten pounds occasionally and five pounds frequently, that plaintiff can stand or walk for up to two hours per day and sit without limitation, and that plaintiff can use both his hands and both his feet for repetitive movements. Tr. 183-85. In response to the question "Does your patient have any condition which does or could produce pain," Dr. Dalmacy checked the box marked "no." Tr. 183.

---

[31] Hydroxyurea belongs to the group of medicines called antimetabolites which can interfere with cell division. Plaintiff's medical records do not specify why he was taking this medication, although it may have been related to his prior diagnosis of thrombocytosis. *See* National Heart and Lung Blood Institute Diseases and Conditions Index, *How Are Thrombocythemia and Thrombocytosis Treated?*, *available at* http://www.nhlbi.nih.gov/health/dci/Diseases/thrm/thrm_treatments.html (noting use of hydroxyurea as a platelet-lowering medicine).

[32] Flomax, a brand-name preparation of the drug tamsulosin HCl, is used for the treatment of BPH. *See* Flomax Prescribing Information and Patient Information, *available at* http://www.4flomax.com/isi.jsp (follow "important safety information" link) (last accessed Mar. 22, 2010).

## DISCUSSION

### I. Standard of Review

"A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted). "Substantial evidence" is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). An evaluation of the "substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld. *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); *see also* 42 U.S.C. § 405(g). Accordingly, the reviewing court "may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

### II. The ALJ's Disability Determination

A claimant is disabled within the meaning of the Social Security Act if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do [her]

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

The Social Security Administration (the "SSA") has promulgated a five-step sequential analysis that requires the ALJ to make a finding of disability if he or she determines: "(1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, . . . (4) that the claimant is not capable of continuing in his prior type of work, . . . [and] (5) there is not another type of work the claimant can do." *Burgess*, 537 F.3d at 120 (internal citations omitted, first alteration in original); *see also* 20 C.F.R. § 404.1520(a)(4).

The claimant must prove his case at steps one through four; accordingly, he bears the "general burden of proving . . . disability." *Burgess*, 537 F.3d at 128. At the fifth step, the burden shifts from the claimant to the Commissioner at step five, requiring the Commissioner to show that in light of the claimant's RFC, age, education and work experience he is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997). However, in making that determination, the Commissioner need not provide additional evidence about the claimant's residual functional capacity, but may rely on the same assessment that was applied in step four's determination of whether the claimant can perform his past relevant work. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also* 20 C.F.R. § 404.1560(c)(2). In addition, "because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Burgess*, 537 F.3d at 128; *see also* 20 C.F.R. § 702.338.

13

Using the five-step sequential process, the ALJ determined at step one that the plaintiff has not engaged in substantial gainful activity since 1991. Tr. 11. At step two, the ALJ determined that during the relevant period (March 8, 2005 through December 17, 2005), the plaintiff suffered from the medically determinable impairments of hypertension and benign prostatic hypertrophy. However, the ALJ determined that neither of these conditions, considered individually or collectively, constituted a "severe impairment" because they could not be reasonably expected to produce symptoms that would limit plaintiff's capacity to work. Tr. 13-15. The ALJ also considered plaintiff's subjective complaint of back pain, but concluded that it did not constitute a severe impairment because: 1) plaintiff had failed to supply any evidence of a significant abnormality; 2) there is no evidence that plaintiff sought treatment for back pain during the relevant period. Because the ALJ determined that plaintiff did not have a severe impairment, he did not reach the question of whether plaintiff's residual functional capacity would have permitted him to return to his past relevant work, or whether there was any other work that plaintiff could perform. *See Williams v. Apfel*, 204 F.3d 48, 49 (2d Cir. 1999) (noting that because the analysis is sequential, if an individual is found not to be disabled at any step, the Commissioner is not required to proceed to the next step).

### III. Analysis

Liberally construed, plaintiff's papers can be read as raising three arguments. *See, e.g.*, *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (noting that courts must liberally construe pleadings and briefs submitted by *pro se* litigants, and read such submissions to raise the strongest arguments they suggest). First, plaintiff contends that the instant motion for judgment on the pleadings should be denied as untimely because it was not served on plaintiff

14

until after March 12, 2009. On January 30, 2009, I granted defendant's request to extend to March 12, 2009 the deadline for the filing of defendant's motion for judgment on the pleadings and ordered that the government shall serve its motion by March 12, 2009. The docket in this case reveals that defendant mailed a copy of its order to plaintiff on March 12, 2009. *See* Docket Entry 13. There can be no dispute that plaintiff received a copy shortly thereafter, as plaintiff submitted an opposition to that motion, dated April 7, 2009. Accordingly, plaintiff's allegation of untimeliness appears to be based on the contention that he did not *receive* the motion until after March 12, 2009. However, pursuant to Federal Rule of Civil Procedure 5(b)(2)(C), service of defendant's papers was complete upon mailing. Service was therefore timely made on March 12, 2009.

Second, plaintiff contends that the ALJ erred in failing to credit plaintiff's subjective complaints of memory loss, frequent debilitating headaches, nosebleeds and back pain. A claimant who alleges a disability based on the subjective experience of pain need not adduce direct medical evidence confirming the extent of the pain; however, the applicable regulations do require "medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain." *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (quoting 20 C.F.R. § 404.1529(a)). Here, the ALJ found that plaintiff had identified no medical evidence of an underlying physical or mental impairment that could reasonably be expected to produce plaintiff's alleged symptoms of debilitating back pain, memory loss, headaches and nosebleeds. Tr. 15. The ALJ reasoned that: (1) while the plaintiff was treated for hypertension, BPH and back pain between 2001 and 2003, he furnished no evidence that he sought further medical treatment for these medical conditions – or indeed for

15

any medical conditions – during the relevant period; (2) there was no evidence in the record confirming significant musculoskeletal impairment which would cause back pain; and (3) there was no evidence in the record that plaintiff complained of headaches, memory loss or nose-bleeds to any physician during the relevant period. *Id.*

The ALJ's conclusions are supported by the record before the court. The sole evidence of a medically determinable source for plaintiff's asserted back pain is a report by Dr. Theodore Jean-Francois which states that plaintiff suffers from osteoarthritis. Tr. 188. Dr. Jean-Francois' statement was not based on any laboratory or tests results,[33] but rather was solely based on a single examination of plaintiff conducted on December 14, 2006 – a year after the termination of the nine-month period relevant here. As noted by the ALJ, Dr. Jean-Francois did not render an opinion as to whether plaintiff suffered from pain or impairment due to osteoarthritis during the relevant period. Tr. 13.

Neither Dr. Jean-Francois nor any other treating physician identified any medically determinable impairment to be the source of plaintiff's remaining ailments. Indeed, despite plaintiff's testimony that he has suffered from disabling memory loss, severe headaches and frequent nosebleeds for a period of nearly twenty years, there is no evidence in the record that he sought medical assistance for any of these ailments at any time prior to 2006. The ALJ's conclusion that these conditions did not give rise to a disabling impairment is further supported by plaintiff's testimony that the only medication he utilized to control the pain during the relevant period was the non-prescription painkiller Advil. Tr. 205-06, 212-15.

Third, plaintiff contends that defendant has simply pointed to a lack of medical documentation, but "has not offered any [affirmative] evidence of its own," Pl.'s Br. at 2, and

---

[33] Dr. Jean-Francois stated in his report that he was not in possession of any laboratory or test results. Tr. 187.

asserts that his failure to supply proof of his disability should be excused because his "lack of education and information as well as pride kept [him] from making [his] claim earlier and caused most of [the relevant] proof to be gone." *Id.* at 1. As noted above, a hearing on disability benefits is a non-adversarial proceeding; accordingly the ALJ has an affirmative obligation to fully develop the administrative record himself. *See Tavarez v. Barnhart*, 124 Fed. Appx. 48, 50 (2d Cir. 2008). However, the defendant is not under any general obligation to offer proof that the plaintiff is not disabled. *See Burgess*, 537 F.3d at 128; *see also Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999) ("where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). On review of the medical records considered by the ALJ, the court is satisfied that the ALJ fulfilled his obligation to adequately develop the record. Plaintiff testified that he was solely treated at Kings County Hospital Center or its affiliated clinic, and the ALJ obtained and considered records from those entities dating back to 2001.[34] Tr. 215. Notably, records dating both before and after the relevant period do not refer to any laboratory or test results diagnosing a medically determinable impairment that could reasonably be the source of plaintiff's reported back pain. In addition, medical records prior to and inclusive of plaintiff's five-day hospitalization in January 2006 (less than one month after the termination of the relevant period) reflect neither a reported history nor contemporaneous complaints of debilitating headaches, nosebleeds, memory loss. *See* Tr. 102.

---

[34] At the March 15, 2007 hearing, plaintiff's counsel stated that a x-ray of plaintiff's back may be absent from the record. Tr. 215-16. Plaintiff could not recall whether an x-ray of his back had been taken. *Id.* The ALJ granted plaintiff's counsel's request to keep the record open for an additional two weeks to allow plaintiff time to supplement the record. The x-ray of plaintiff's back was apparently either determined not to exist, or could not be located, and is not contained in the administrative record.

In sum, substantial evidence in the record supports the ALJ's decision declining to find that plaintiff suffered from a severe impairment.

**IV.     Conclusion**

For the reasons set forth above, the Commissioner's decision is affirmed and defendant's motion for judgment on the pleadings is granted. The Clerk of this court is respectfully requested to enter judgment in favor of defendant and close this case.

The defendant shall serve a copy of this Memorandum, Decision and Order on the plaintiff and file a declaration of service by ECF no later than March 30, 2010.

SO ORDERED.

_____/s/_____
Kiyo A. Matsumoto
United States District Judge

Date:   March 29, 2010
        Brooklyn, New York